Filed 4/8/16  In re William H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re WILLIAM H. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH & HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL H.,<br><br>    Defendant and Appellant. | A145703, A146513, A146762<br><br>(Mendocino County Super. Ct. Nos. SCUK-JVSQ-14-16959-01, SCUK-JVSQ-14-16960-01 |

Appellant Paul H. is the father of 11-year-old William and eight-year-old Michael, who were adjudged dependent children in 2014. (Welf. & Inst. Code, § 300).[1] In April 2015, father's family reunification services were terminated and a permanent planning hearing set. Two months later, the court found father's visitation with the children to be detrimental to the children and suspended visitation. In this consolidated proceeding, father appeals the order suspending visitation and subsequent orders continuing the suspension. Father also challenges an order authorizing a limited release of the children's biographical information to locate potential adoptive parents. The children's mother does not appeal. We shall affirm the orders.

---

[1] All further section references are to the Welfare & Institutions Code except as noted.

**Statement of Facts**

The Mendocino County Health and Human Services Agency (county) received numerous reports of neglect by both parents throughout the children's lifetimes. In 2011, the parents separated and father was awarded physical custody with visitation by mother. The reports of neglect continued.

In March 2014, the county detained the children in protective custody and filed a juvenile dependency petition. A contested jurisdictional hearing was held in April 2014. Evidence was presented that mother hit the children and exposed them to physical risk of harm on numerous occasions and that father burned Michael with a cigarette, kicked him "in his private parts," and spanked him on "his buttocks to the extent that marks were left." Father chased Michael with a running chain saw when the boy was five years old. William said the blade came within four inches of his brother's back. Father dismissed the incident as "teasing" the boy in hope of getting him to "grow out of being scared of the loud sound." There was also evidence that father permits the children to spend unsupervised time with mother even though they are unsafe in her care due to her severe mental health issues; permits the children to be around drug traffickers at father's home; and fails to provide adequate food and clothing. The children's therapist reported that the children suffer from posttraumatic stress disorder (PTSD) and continue to experience ongoing stress and trauma at home. The court asserted jurisdiction over the children, finding that they have suffered, or were at substantial risk of suffering, serious physical harm inflicted non-accidentally upon them by their parents (§ 300, subd. (a)), that the parents failed to protect their children (§ 300, subd. (b)(1)), and that the children are suffering serious emotional damage (§ 300, subd. (c)). The disposition hearing was held in May 2014. The court ordered family reunification services and supervised visitation for both parents. We affirmed the jurisdictional and dispositional orders. (*In re William H.* (Feb. 10, 2015, A142255) [nonpub opn.].)

A six-month review hearing was held in November 2014. The county reported that mother had not visited her children nor participated in services and recommended

2

terminating reunification services. Father had been arrested for domestic violence in July 2014 and, in September 2014, incarcerated on multiple drug charges. His participation in services was "minimal" and his visits before his incarceration "sporadic" but the county recommended continuing services to him. The court terminated family reunification services to mother but continued them for father.

At the 12-month review hearing in April 2015, the county reported that father "made virtually no progress in resolving his issues" and recommended terminating family reunification services and setting a permanent planning hearing. Father remained incarcerated and was not expected to be released until August 2015. The children had visited father regularly in jail, with sometimes negative results. At a February 2015 visit, "father insinuated that William did not tell the truth and that was why the children were taken. William then left the visit and did not return. The foster parents reports that William was very upset when he got home and told her that his father blamed him for all of their problems. The therapist reports that William was very upset and also stated his father blamed him for being detained. William told his therapist he did not want to see his father again." The court terminated father's family reunification services and set a permanent planning hearing. (§ 366.26.) The court allowed visitation to continue. We denied a writ petition challenging the court's order. (*In re Paul H.* (July 23, 2015, A144880) [nonpub opn.].)

In June 2015, William was diagnosed with a major depressive disorder and prescribed a psychotropic medication. Later that month, the children's counsel filed a motion asking that visitation with father be suspended and the county joined in the request. (§ 388.) The children's counsel asserted that the "visits are detrimental to the children in that they are triggering an increase in PTSD symptoms." Counsel attached a letter from the children's therapist in which the therapist opined that "visits with father are complicating their progress in treatment." The therapist said her "[c]oncerns are based on statements made [to her] during individual therapy sessions, and [county social worker] reports of visits with father." The therapist noted that, during an early February 2015 visit with father, "Michael was rough housing, head butting, slapping and punching

3

William" and Michael "threw himself onto the wall and onto the floor." At a visit two weeks later, Michael was "hitting his head on the window and wall during the visit." In late February, William told the social worker "about his father kicking his puppy 'like a football and killed it.' During that visit, his father blamed William for being in foster care[, saying] he lied and made up stories about the 'white powder.' William became upset and his father told him to get out of the 'boohoo phase.' William then left the visit." In May 2015, William was talking to the therapist about his visits and said "I don't like the visits . . . . I just know that when I see him, I feel more scared." The therapist concluded: "visits with father are triggering an increase in PTSD symptoms (excess worry; increased trauma reenactment [rough housing, physical aggression, self-harm behaviors – Michael throwing himself on the ground and hitting his head on the wall/window]; intrusive memories [i.e., father killing puppy; father chasing them with a chain saw]; and increase anxiety/excess worry)."

The county asserted that the visits were detrimental to the children and advised the court that William wanted the visits to end. The county submitted a note William wrote to father saying he was going to "talk with the judge" about stopping the visits. William told father "I feel safer with you not in my life." The county also submitted a log prepared by the social worker who supervised the visits. During the visit on February 4, 2015, Michael slapped William, headbutted William's knee, punched William's foot several times, twice threw himself off the table, and threw himself into the floor. On February 11, father asked the boys at the start of the visit, "Where are your smiles?" and William replied, "We left them at home." Father talked about trips together and mentioned that he once dozed off on the beach. William responded "you were dozed off most of the time growing up." On February 18, father and children seemed to be "in a bad mood." Michael hit his head on the wall and, a few times, on the window. Midway through the half-hour visit, Michael asked if the visit was over. On February 25, while waiting for father at the jail, William told the social worker "about a time that he got in trouble and his dad kicked his puppy like a football and killed it. This upset William and when [father] came in to the visit room, William did not make eye contact with [father]. Instead he sat with his

4

head hanging down. [Father] asked what was wrong and William said 'nothing.' Michael started to tell [father] and said 'remember when you . . . never mind, I'm not saying it.' William looked at [the social worker] and whispered 'I just remember, he didn't kick it, he ran it over.' He then asked [father] about it. He said 'remember when you ran my puppy over on your mountain bike? [Father] stated that he did not remember that. [Father] changed the subject." Later in the visit, father talked about the importance of being honest and said William did not tell the truth when telling child protective services about "piles of white powder." William replied "I was saying what was true, I can't keep that stuff inside, it rots me." The social worker "stepped in and said that we needed to change the conversation to something positive. [Father] didn't seem to care because he didn't change the subject and asked William 'was I a bad dad?' William shook his head as to say 'so-so.' [Father] said 'didn't I let you do whatever you wanted and go to your friend's house when you wanted?' William said 'that's not what you were supposed to do. That's why we were taken, because you weren't there.' At that point [the social worker] stepped in again and tried to redirect [father] by saying we need to focus on the present and positive things. William looked very upset and was sitting with his head down. [Father] said to him that he needed to get out of the boohoo phase. William then stood up and said he needed to take some time. He left the visit room and left for the remainder of the visit. Michael seemed a little upset as well and [father] told him the same thing about the boohoo phase. . . . [Father] had Michael go check on William a few times and ask him to come back in. William kept saying no and sat out in the waiting area. [Father] told Michael that he was proud of him for not having an attitude like his brother. Michael asked three times toward the end of the visit if the visit was over yet. When the visit ended, [the social worker] asked William if he wanted to say goodbye and he said no." Father was "a little quiet" on the next visit on March 25 and watched the boys play "more than he interacted with them." Several subsequent visits went smoothly. On April 15, father "was very appropriate and stayed engaged the entire visit." On May 27, William did not attend. That morning, William hit Michael on the head with a shoe and locked himself in his room.

An evidentiary hearing was held on June 25, 2015, to consider the request to suspend visitation. William, age 11, testified in chambers. William said he did not want to visit his father. When asked why he wanted to stop the visits, William said "he's scary." William was asked "how he's scary" and the boy said "[t]he abuse that he's done." William said he feels "[v]ery nervous" before a visit and feels "safer after [he] leaves." The boy said father has "done some bad things to me" and "seen him do a lot of things." William said "that stuff has pretty much, like, scarred me for life." William was asked if his father "wasn't in jail, if he was in a better place, would you want to see him?" and William said "no."

Michael, then age seven, testified in chambers that he liked visiting his father and was not afraid of him. Asked "how do you feel usually after a visit with your father," Michael said "Usually just happy." Michael was asked "if you had your choice, would you want to visit with him more or visit with him less" and replied "more."

The court found that "visitation between the children and their father under the current circumstances is detrimental to both of them" and ordered the visits suspended. The court acknowledged that Michael asked for visitation to continue but found that "[a] seven-year old who expresses a desire to visit, nevertheless doesn't have the capacity to tell the court about the complicated psychological impacts of his visits whereas his therapist can. The therapist notes that the foster parent is seeing behaviors which the therapist interprets to be triggers for [PTSD] symptoms for both children, William and Michael. [¶] William, for someone who's 11 years old, is extraordinarily insightful and articulate about his internal feelings. He's been able to very directly state to the court what I think Michael at his younger age is simply not developmentally able to do." The court found visitation to be detrimental for both children "at this juncture" and suspended visitation subject to reconsideration at the permanent planning hearing or another time upon a change in circumstances.

A permanent planning hearing began on August 5, 2015, but was continued to January 2016 to allow the county additional time to investigate adoptive placements. The court identified adoption as the goal but did not terminate parental rights nor find

adoption likely. No adoptive parent had yet been identified and the children were found difficult to place because they are in a sibling group that should stay together, are each age seven or older, and William is diagnosed with a disability (major depressive disorder). In an effort to reach potential adoptive families, the county and the California Department of Social Services (CDSS) proposed listing the children on a statewide photo-listing web site. (Fam. Code, § 8707.) The court set a hearing for August 19, 2015, to consider the request. Meanwhile, at the August 5, 2015 hearing, father asked for visitation to be reinstated. The county asserted that visitation remained detrimental to the children and the court continued the suspension of visitation. The court stated that the children "went through a great deal of abuse and neglect in the father's home" and had "some difficult visits" with him in which father blamed the children for being placed in foster care. The court found that the children were "hurt" and "angry" and were experiencing "conflicting, difficult feelings" that made visitation detrimental at the present time. The court concluded that suspended visitation was "the appropriate order unless a change of circumstances is shown."

A hearing to consider the release of limited information on the children for locating potential adoptive families was held on August 19, 2015. A CDSS adoptions social worker stated there is a shortage of families looking to adopt "a sibling set of two older boys with behavior problems" and asked to use a website and other media to help find a potential adoptive family for them. The website is California Kids Connection, which lists children available for adoption. The website includes the child's photograph, first name, age, and a short biographical description. Father objected to the release of information. The court granted CDSS permission to "use electronic and print media, including photo-listing the children on the California Kids Connection website, in an effort to locate an adoptive family."

On October 13, 2015, father filed a petition for modification of the court's prior order suspending visitation, claiming changed circumstances. (§ 388.) Father asked for visitation to be reinstated, stating he "has been released from jail so the visits would be in a more comfortable setting. [Father] is living a legal lifestyle, complying with his

7

conditions of probation including a no drug/no marijuana provision. [Father] has a full-time job . . . and is providing full medical/dental coverage for his children through employment."

It was apparently unknown to father that, a day before he filed his petition, William was "hospitalized due to suicidal threats." A week later, on October 20, 2015, the county applied to the court for the use of additional psychotropic medication for his treatment. The county asserted that William "has been taking Prozac for a year but continues to experience mood instability and suicidal thoughts." The court denied father's modification motion on October 20 without a hearing and, two days later, granted the county's medication request. In denying father's request to reinstate visitation, the court found that the proposed change does not promote the best interests of the children and that adoption has been identified as the children's permanent plan.

In November 2015 William was diagnosed with bipolar disorder. He continued to have "[d]aily suicidal ideation" and "severe depression" but was released from the hospital to his foster home. The record available to us on appeal ends in November 2015, before the continued permanent planning hearing scheduled for January 2016.

Father timely filed several notices of appeal in which he challenges the June 25, 2015 order suspending visitation (A145703); the August 5, 2015 order continuing the suspension of visitation (A146513); the August 19, 2015 order permitting use of media to locate potential adoptive families (A146513); and the October 20, 2015 order denying his petition to reinstate visitation (A146762). We consolidated the appeals for purposes of decision.

## Discussion

1. *Orders suspending visitation and continuing the suspension*

Father contends that the juvenile court erred in suspending visitation with Michael in June 2015 and continuing the suspension in August 2015. He does not challenge the court's finding that visits were detrimental to William but maintains that the evidence does not support the same finding as to the younger boy.

8

A court that schedules a hearing to determine the permanent plan for a dependent child shall terminate reunification services but "shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h).) Detriment is adjudicated by the juvenile court under a preponderance of the evidence standard (*In re Manolito L.* (2001) 90 Cal.App.4th 753, 761-762) and reviewed on appeal under the substantial evidence standard (*In re A.J.* (2015) 239 Cal.App.4th 154, 160).

Substantial evidence supports the juvenile court's finding that visits between father and Michael endangered the child's emotional well-being and thus would be detrimental. Father has a history of physically abusing Michael. Dependency was established upon evidence that father burned Michael with a cigarette, kicked him "in his private parts," and spanked him on "his buttocks to the extent that marks were left." Father also has a history of insensitivity toward Michael. The boy cried in fear when father chased then five-year-old Michael with a chain saw, yet father failed to appreciate the psychological impact of his conduct and dismissed it as "teasing" the boy in hope of getting him to "grow out of being scared of the loud sound." During one of father's visits with the boys, William left the room in tears after father blamed him for being placed in foster care and, when Michael also became upset, father told him what he told his older brother — that "he needed to get out of the boohoo phase."

A social worker who supervised Michael's visits with father reported that, during a visit in February 2015, Michael slapped William, headbutted William's knee, punched William's foot several times, twice threw himself off the table, and threw himself into the wall. On another visit, Michael hit his head on the wall and, a few times, on the window. Michael's therapist asserted that the boy's "physical aggression" was "trauma reenactment," which is a symptom of PTSD, and that his throwing himself on the ground and hitting his head on the wall and window were "self-harm behaviors," also symptomatic of PTSD. The therapist stated that "visits with father are triggering an increase in PTSD symptoms": trauma reenactment, self-harm behaviors, excess worry, and intrusive memories. The "intrusive memories," such as father chasing Michael with a

9

chain saw, occur "throughout the day" and impact the boy's "functioning" at home and school, leading to "difficulty focusing, hypervigilance, [and] disruptive behavior."

Father notes that Michael testified that he liked his visits with father and wanted them to continue. The juvenile court did not, as father contends, "ignore" this testimony. The court carefully considered the testimony but found that seven-year-old Michael may not "have the capacity to tell the court about the complicated psychological impacts of his visits whereas his therapist can." The court also found that 11-year-old William, who was "insightful and articulate about his internal feelings" provided some evidence of what Michael may have been experiencing but was "not developmentally able" to express. The court reasonably considered the therapist's opinion and the older brother's testimony in evaluating the impact of the visits on Michael's emotional well-being and finding the visits to be detrimental.

There was also no error in continuing the suspension in August 2015. Visitation had been suspended just six weeks previously. The request to lift the suspension was made orally at the initial permanent planning hearing without any demonstration of changed circumstances or an offer of proof as to a change in circumstances. The court properly concluded that suspended visitation was "the appropriate order unless a change of circumstances is shown."

2. *Order denying petition to reinstate visitation.*

In October 2015, four months after visitation was suspended, father petitioned to reinstate visitation, claiming changed circumstances. (§ 388.) The court denied the petition without a hearing. Father argues that the court abused its discretion in summarily denying his petition because he presented a prima facie case that visitation would promote the children's best interests, thus warranting an evidentiary hearing.

"Under section 388, a party may petition the court to change, modify or set aside a previous court order. The petitioning party has the burden to show, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed modification is in the child's best interests. [Citations.] The court must liberally construe

10

the petition in favor of its sufficiency. [Citation.] 'The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' " (*In re A.S.* (2009) 180 Cal.App.4th 351, 357-358.) "[T]he petitioner must make a 'prima facie' showing of 'facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' " (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) " '[I]f the petition fails to state a change of circumstances or new evidence that might require a change of order, the court may deny the application ex parte.' " (*Ibid.*) "We review a summary denial of a hearing on a modification petition for abuse of discretion. [Citation.] Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re A.S., supra,* at p. 358.)

We find no abuse of discretion here. Father's petition stated the changed circumstances to be that he "has been released from jail so the visits would be in a more comfortable setting. [Father] is living a legal lifestyle, complying with his condition of probation including a no drug/no marijuana provision. [Father] has a full-time job . . . and is providing full medical/dental coverage for his children through employment." These changes are of course positive and commendable but they do not necessarily remedy the conditions that led to the suspension of visitation. Visitation was suspended because the visits triggered an increase in PTSD symptoms, compromising the treatment and mental health of both children. Father's petition did not address these issues and thus did not make a showing of a change in circumstances sufficient to require a hearing.

We respect father's position that, absent detriment to the child, a parent has a right to visitation unless and until parental rights are terminated. As father notes, "[v]isitation may be seen as an element critical to promotion of the parents' interest in the care and management of their children, even if actual physical custody is not the outcome." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) There was, however, a finding of detriment here and that finding was supported by substantial evidence. Father's petition for reinstatement came just four months after visitation was suspended. At that time, there was no indication in the record that Michael's mental health had stabilized. William's

mental health clearly had not stabilized, as he was hospitalized with suicidal ideations. While no hearing was required at that juncture, given the short period of suspension and the lack of any indication of changed circumstances, prolonged suspension of visitation may well require an evidentiary hearing to reevaluate whether the initial finding of detriment is supported by current conditions.

3. *Order permitting use of media to locate potential adoptive families.*

The juvenile court granted CDSS permission to "use electronic and print media, including photo-listing the children on the California Kids Connection website, in an effort to locate an adoptive family." Father argues that the children are not eligible for listing on the website and that the listing impermissibly disseminates confidential information.

As noted above, the website is used to recruit adoptive families by posting the photograph, first name, age, and a short biographical description of children available for adoption. With limited exceptions, "[a]ll children legally freed for adoption whose case plan goal is adoption shall be photo-listed" on the website. (Fam. Code, § 8707, subd. (d).) A child that has not yet been freed for adoption—like the children here—may be photo-listed if the child's case plan goal is adoption and consent to register the child is obtained from the parents or the court. (*Ibid*; Cal. Code Regs., tit. 22, § 35017, subd. (d).)

Adoption was identified as the permanent placement goal for the children, thus authorizing the court to consent to photo-listing the children in an effort to locate an adoptive family. Father claims there is a distinction between adoption as a "permanent placement goal" (the term in the court's order) and adoption as a "case plan goal" (the term in the statute) but makes no effort to articulate a difference apart from the slight variation in terminology. He simply argues that adoption was not identified as the "case plan goal"—in those exact words—so the children did not come "within the penumbra" of the statute. There is no meaningful distinction between adoption as the permanent placement goal and adoption as the case plan goal. The statute is clearly intended to permit photo-listing children for whom adoption is the goal, as the children here. The

court was authorized to permit photo-listing and the limited dissemination of confidential information it entails.

## Disposition

The juvenile court orders of June 25, August 5, August 19 and October 20, 2015 are affirmed.

_____
Pollak, Acting P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.